

**TENNESSEE BUREAU OF WORKERS' COMPENSATION**
**IN THE COURT OF WORKERS' COMPENSATION CLAIMS**
**AT MEMPHIS**

| | |
|---|---|
| **WENDY HARRIS,**<br>        **Employee**,<br><br>v.<br><br>**BAPTIST MEMORIAL**<br>**REGIONAL REHABILITATION**<br>**SERVICES, INC.,**<br>        **Employer**. | **Docket No. 2024-80-7110**<br><br><br>**State File No. 409962-2023**<br><br><br>**Judge Amber E. Luttrell** |

## COMPENSATION ORDER

Ms. Harris sought benefits from a compensable left-wrist injury. The issues include: 1) whether Ms. Harris has complex regional pain syndrome; and 2) whether she is entitled to permanent total or permanent partial disability with increased benefits. For the reasons below, the Court finds Ms. Harris did not prove a compensable complex regional pain syndrome injury or that she is permanently and totally disabled. Instead, Ms. Harris established a left-wrist sprain and ganglion cyst injury and a 1% impairment. She is entitled to permanent partial disability with increased benefits.

### Claim History

Ms. Harris, a high-school graduate with a respiratory therapy certification, worked for 37 years as a respiratory therapist. On June 3, 2023, she injured her left wrist performing chest compressions during CPR on a patient. She heard a "pop" and felt "excruciating pain and swelling."

Baptist authorized treatment with Dr. Jeffrey Cole, Ms. Harris's panel-selection, who treated her for a wrist sprain and a ganglion cyst. Before discussing his treatment, a summary of previous related medical treatment is necessary.

Ms. Harris sought past treatment with multiple physicians dating back to at

1

least 2014 for left hand and wrist symptoms. That year, she had numbness and tingling and a "pins and needles sensation" in her third and fourth fingers of her left hand. A doctor diagnosed carpal tunnel syndrome. Two years later, she sought treatment for chronic left-sided neck and left-upper extremity pain. After a cervical MRI, she received a diagnosis of multi-level degenerative disc disease. She had two C5-6 epidural steroid injections and continued treatment for two years.

Then in December 2021—18 months before her work injury— she was diagnosed with degenerative disc disease with cervical radiculopathy and stenosis. The doctor ordered another MRI that showed advancement of her disc disease predominantly at C5-6. He also found diminished sensation on the left at C5 and C6 dermatomes and diagnosed a herniated cervical disc and disc disease with radiculopathy and ordered a block at C6-7.

*Treatment and Expert Medical Proof*

After the work injury, Ms. Harris reported left-wrist joint pain, and Dr. Cole found a new, small volar wrist ganglion cyst confirmed by MRI. He recommended surgery.

After surgery, Dr. Cole noted Ms. Harris had "done well," but she also complained of pain and functional disuse of her left hand and arm. Dr. Cole found full passive motion and normal exam. He wrote, "from a diagnosis and treatment standpoint, she had a . . . straightforward volar ganglion cyst and . . . excision. There may be a mental component to this, as she has voiced several times having apprehension and concerns with doing regular work[.]" Ms. Harris discussed with him that she would see her personal pain management physician, Dr. Samuel Polk, for consideration of a block.

The cervical block helped, and Ms. Harris returned to Dr. Cole reporting some improvement. Her left arm exam was normal with full passive range of motion, but she avoided using her left hand. Dr. Cole found "several inconsistencies on exam" but wrote, "I do feel she is making progress." However, her subjective symptoms far exceeded what should be expected after a volar wrist ganglion excision. Over the next few months, Dr. Cole continued to express concern about inconsistencies in his exams and her subjective symptoms being "well beyond expectation."

In January 2024, Dr. Cole placed Ms. Harris at maximum medical improvement and noted she continued to describe symptoms and difficulty using the hand and arm. She also was consistent in reporting her fear of attempting to return

to work. He placed permanent restrictions on the left arm of no pushing, pulling, or lifting over 15 pounds.

Ms. Harris later underwent a functional capacity evaluation, where the therapist observed that Ms. Harris did not "give consistent effort with testing and has nonphysiological responses with testing, palpation, and movement."

Dr. Cole reviewed the results and felt that the functional capacity evaluation was consistent with his observations over the many office visits. He wrote, "she has reported other medical issues that are affecting her day-to-day life as well as her return to full duty work. It has been my impression for quite some time that Ms. Harris does not intend to return to her previous job." Giving her the benefit of the doubt, Dr. Cole maintained her permanent restrictions but encouraged her to use her left arm. He again placed her at maximum medical improvement on June 13, 2024, and assigned a 1% impairment.

During Dr. Cole's treatment, in September 2023, Ms. Harris also saw a rheumatologist, Dr. Tracey Robinson, on her own for a history of chronic pain for the last ten years but "worse the last 1-2 years." Ms. Harris specifically reported that "in the last year and a half, her hands have been significantly bothersome." She told Dr. Robinson about her work injury. Dr. Robinson diagnosed complex regional pain syndrome. In June 2025, Dr. Robinson noted her complex regional pain syndrome seemed stable.

Ms. Harris also saw Dr. Polk for neck pain radiating to the left limb. He diagnosed cervical radiculopathy secondary to her multi-level disc disease.

Ms. Harris saw Dr. Schrader for an independent medical evaluation. In his deposition, he noted her preexisting history of a herniated cervical disc involving pain in both upper extremities, her treatment with cervical injections, and her work injury.

On exam, he found guarding of the left arm and her left arm was cooler than the right. She was hypersensitive to light touch along the radial forearm index and dorsally and had wrist swelling. He did not identify any trophic changes or nail changes. She had significant joint stiffness and some decreased range of motion. Dr. Schrader said her exam correlated with complex regional pain syndrome type 1 and was caused by her work injury and surgery.

Dr. Schrader said he used a differential diagnostic process, as the AMA

3

Guides require. He dismissed her preexisting cervical condition and radiculopathy as a possible explanation for Ms. Harris's symptoms. He stated that radiculopathy is "specific to one nerve pattern being pinched" and her treating physician "did not attribute the findings of the wrist that occurred after the injury and surgery from that radiculopathy."

Dr. Schrader recommended Ms. Harris not push or pull more than five pounds occasionally, avoid grasping and lifting more than five pounds with her left arm, and wear a wrist splint for work.

As for impairment, Dr. Schrader assigned 12% because she "fit all the diagnostic categories" under Table 15-14. He determined she had five diagnostic criteria in Table 15-2, which put her in Class 2 of Table 15-26.

The parties used the Bureau's Medical Impairment Rating Registry and selected Dr. Keith Nord. Dr. Nord reviewed Ms. Harris's preexisting treatment records for cervical radiculopathy and treatment with injections and her records from Dr. Cole. He also examined Ms. Harris.

On exam, Dr. Nord found Ms. Harris's effort for exam of the left arm was "poor," and "the hypersensitivity was significantly decreased or nonexistent when [Ms. Harris] was distracted." He did find some increased hypersensitivity specifically in the C6 distribution. Otherwise, he found no hypersensitivity or altered sensation.

Dr. Nord commented, "A prominent finding . . .was hypersensitivity at the C6 distribution along the superficial radial sensory nerve and radial wrist with or without distraction suggesting true pathology likely related to her chronic cervical radiculopathy." Dr. Nord found no complex regional pain syndrome symptoms.

Dr. Nord diagnosed work-related injury left-wrist sprain and left ganglion cyst. He commented, "this correlates most strongly . . . that the hypersensitivity in the left arm most closely matches the diagnosis of C5-6 radiculopathy, further supported by her previous MRIs and treatments by pain management with improvement in symptoms after cervical steroid injections."

Dr. Nord assigned a 1% rating for Ms. Harris's left-wrist sprain and volar ganglion cyst under Table-15-3 of the AMA Guides. He explained:

There are no clinical findings today that support [the] diagnosis of

complex regional pain syndrome. She has no trophic changes, she has very specific dermatomal hypersensitivity in a distribution that matches her MRI findings in the C5-6 distributions. I also do not find sufficient evidence to meet criteria for the diagnosis of complex regional pain syndrome per the AMA Guides in her clinical notes from rheumatology or pain management. As such, it is not appropriate to use the rating by Dr. Schrader, MD on 9/11/2024, which presumes [a] diagnosis of CRPS.

Baptist hired Dr. John Lochemes to perform a records review. He read Ms. Harris's complete records.

Dr. Lochemes agreed with Dr. Cole's rating and commented, "it is clear that he [did] not think she meets the criteria for CRPS and he stay[ed] with his diagnosis of wrist sprain and ganglion cyst excision." Dr. Lochemes agreed with that diagnosis. He said that Ms. Harris did not meet the diagnostic criteria for complex regional pain syndrome under the AMA Guides. He agreed with Dr. Nord that her symptoms were consistent with her MRI findings of cervical radiculopathy at C5-6. She had cervical spine pathology before the work injury and "compelling evidence of prior history of neck and arm pain."

Dr. Lochemes also placed a 1% impairment. He explained that to rate complex regional pain syndrome under the AMA Guides, the physician must first determine if it is a ratable condition. Complex regional pain syndrome can only be rated when the diagnosis has been present for at least a year, is confirmed by more than one physician, and the differential diagnosis process ruled out other diagnoses. He said that Dr. Shrader's rating was improper due to the first and third requirements.

Regarding the differential diagnosis, Dr. Lochemes testified that Dr. Schrader did not reference any psychological testing, disuse atrophy, fictitious disorder, malingering, or symptom magnification. Nor did Dr. Schrader review Ms. Harris's preexisting cervical medical records or MRIs.

He also stated that Dr. Schrader did not follow the AMA Guides. Dr. Schrader determined Ms. Harris had five diagnostic criteria on Table15-25. Using Table 15-26, Dr. Schrader placed her in Class 2 to arrive at the 12% rating. However, the AMA Guides require that a patient have six or more criteria from Table 15-25 to be placed in Class 2.

5

## *Vocational Proof*

Dr. David Strausser, Ms. Harris's vocational expert, found her 100% vocationally disabled.[1]

He acknowledged he did not have a copy of Dr. Cole's records available at his deposition to know if he reviewed his complete records but stated those records would not be relevant to his opinions. Dr. Strausser also acknowledged that he had not reviewed Ms. Harris's functional capacity evaluation. He performed a transferrable skills analysis, labor skills analysis, and earning-capacity assessment but did not have documentation of these at his deposition or listed in his report. He said he reviewed her records and the depositions of Drs. Lochemes and Schrader and evaluated Ms. Harris by telephone.

Dr. Strausser considered permanent restrictions assigned by Drs. Cole and Schrader, along with Ms. Harris's "self-reported restrictions." Among them, she limits herself to 45 minutes sitting, has difficulties standing and walking after 15 minutes, and must lie down throughout the day.

Dr. Strausser applied Dr. Cole's and Dr. Schrader's left-arm restrictions to both arms, saying that whether her restrictions apply to one arm or both makes no difference. He also said that "she has complex regional pain syndrome, which impacts her functioning significantly.

Dr. Strausser said Ms. Harris had a "solid" work history, was a high school graduate, obtained certification in respiratory therapy, and consistently worked in that field. He stated that respiratory therapy "is where her skill set is." Dr. Strausser concluded that, had Baptist accommodated Dr. Cole's restrictions, Ms. Harris still would not be able to return to work "in any functional capacity."

Bruce Brawner, Baptist's vocational expert, reviewed all relevant records including Dr. Strausser's vocational assessment, and concluded Ms. Harris is employable.

---

[1] Baptist filed a pre-trial motion to exclude Ms. Harris's vocational expert, Dr. Strausser's opinions on grounds that his testimony did not meet the requirements of Tennessee Rules of Evidence 702 and 703. The Court took it under advisement. Dr. Strausser is an expert by knowledge, skill, experience, training or education. Because the Court finds the arguments raised by Baptist go to the weight, rather than the admissibility, of Dr. Strausser's opinion testimony, the Court denies the motion.

He detailed his methodologies. He considered the restrictions of Drs. Cole and Schrader and noted that those restrictions affect Ms. Harris's left-upper extremity only. He stated that a vocational consultant only relies on restrictions assigned by physicians because they have the training, knowledge, and experience to assign work restrictions. Subjective self-reported restrictions are not relied on by vocational consultants, "you go with medical information."

He considered either scenario of restrictions. Using Dr. Cole's restrictions, Mr. Brawner found the following jobs that most closely matched Ms. Harris's vocational profile: outpatient admitting clerk, cardiac monitor tech, Holter scanning technician, hospital admitting clerk, pulmonary function technician, electrocardiograph technician, and hospital unit clerk. Using Dr. Schrader's restrictions, she could work as a hospital receptionist, admitting clerk, cardiac monitor tech, customer service rep, rehabilitation clerk, and hospital unit clerk. This list of jobs was not exhaustive, and jobs are available to Ms. Harris in her area.

Mr. Brawer further testified that Ms. Harris's transferrable skills and abilities from her past employment would benefit her in the competitive labor market. He concluded that Ms. Harris "is capable of returning to gainful employment."

*Lay Proof*

Ms. Harris testified that her work history as a respiratory therapist involved performing advanced life support and was "very demanding." She intended to keep working, and her preexisting neck condition was not bothering her at the time of her injury. She said that she had not seen her pain management doctor in two to three years and described her pain and symptoms from her cervical condition as different from her current symptoms.

Ms. Harris did not return to Baptist after her injury. After completing authorized treatment, Baptist sent her a letter stating its understanding, based on her restrictions and conversations with her, that "there are no other vacant positions for which you are qualified which would permit you to return to work at this time."

Ms. Harris has not applied for any jobs and said she "cannot perform any job at this moment." Ms. Harris currently avoids using her left arm due to pain, a burning sensation, and weakness.

She acknowledged on cross-examination that, contrary to her testimony that she had not treated for two or three years for her cervical condition before her injury,

her records show she received a block in December 2021, 18 months before her injury. Ms. Harris also disagreed with Dr. Cole's, Dr. Nord's and the functional capacity evaluator's statements regarding poor effort during examinations.[2]

## Findings of Fact and Conclusions of Law

At a Compensation Hearing, Ms. Harris must show by a preponderance of the evidence that she is entitled to benefits. Tenn. Code Ann. § 50-6-239(c)(6) (2025).

### *Injury and Impairment*[3]

The parties agreed that Ms. Harris sustained a compensable left wrist sprain and ganglion cyst. The dispute was whether the work injury also caused complex regional pain syndrome and the correct rating. In evaluating conflicting expert testimony, a trial court may consider, among other things, "the qualifications of the experts, the circumstances of their examination, the information available to them, and the evaluation of the importance of that information through other experts." *Brees v. Escape Day Spa & Salon,* 2015 TN Wrk. Comp. App. Bd. LEXIS 5, at *14 (Mar. 12, 2015).

Here, all four doctors are orthopedic physicians. All four physicians have years of experience in treating and evaluating workers' compensation patients and are qualified to give opinions.

As for the circumstances of their examinations and the information available, Dr. Cole saw her at least ten times over one year and provided significant treatment, including surgery. He had available her treatment records, hand/wrist MRI, therapy records, functional capacity evaluation, Ms. Harris's history of her preexisting conditions, and treatment with her personal physician. As her panel-selected physician, his causation and impairment opinions are presumed correct. Tenn. Code Ann. §§ 50-6-102(12)(E), 50-6-204(k)(7).

---

[2] Trent Riden, Baptist's Assistant Director of Employee Health, also testified. He agreed that her respiratory therapist position did not comply with her permanent restrictions.

[3] Baptist moved to exclude portions of Dr. Schrader's testimony. Counsel objected to Ms. Harris's counsel's questions to Dr. Schrader as to the specific corporate entity that employed Ms. Harris and the suggestion that Baptist was "arguing against their own doctors." Baptist argued the questions were speculative and not supported by the evidence. The Court sustains the objection. Baptist also moved the Court to exclude Dr. Schrader's testimony on his opinions on Dr. Nord's report, arguing that Dr. Nord's report was an "undisclosed opinion." The Bureau discloses MIRR reports to all parties; the objection is overruled.

Dr. Nord, as the MIRR physician, saw Ms. Harris once and performed a thorough exam. He reviewed and summarized records of her complete treatment, preexisting condition, and unauthorized treatment. Under section 50-6-204(d)(4), his impairment opinion is presumed correct and rebuttable only by clear and convincing evidence.

As for both parties' experts, Dr. Lochemes performed a records review and considered all of the relevant records, while Dr. Schrader saw her once. Dr. Schrader did not have Ms. Harris's pre-injury cervical condition records or MRIs, her September 2023 rheumatology record, or her functional capacity evaluation.

The circumstances of the evaluation favor Drs. Cole and Nord, given the lengthy treatment with Dr. Cole and the thoroughness of both physicians' exams. The information available to the physicians favors Drs. Cole, Nord, and Lochemes, who had more complete records to analyze than Dr. Schrader, including the records of Ms. Harris's long-term treatment for cervical radiculopathy.

The Court finds unpersuasive Dr. Schrader's opinion that Ms. Harris developed complex regional pain syndrome arising primarily out of her work injury. Further, his 12% impairment opinion for that diagnosis does not overcome the presumptions of correctness afforded Drs. Nord and Cole.

This is because all the physicians agreed that complex regional pain syndrome is a diagnosis of exclusion, and the AMA Guides require an extensive differential diagnosis process to rule out any other possible cause for the symptoms. Yet, Dr. Schrader summarily dismissed Ms. Harris's preexisting cervical condition and radiculopathy as a possible explanation for her symptoms without reviewing the records or cervical MRIs. He also did not reference any psychological testing, disuse atrophy, fictious disorder, malingering or symptom magnification. His opinion is unsupported by Drs. Cole, Nord, and the functional capacity evaluator, who found multiple inconsistencies in her exams.

On the other hand, Dr. Nord considered all the available records and studies and found no clinical evidence of complex regional pain syndrome. His conclusion was compelling: that Ms. Harris has very specific dermatomal hypersensitivity at C5-6 that matched her MRI findings and C5-6 radiculopathy diagnosis.

Applying the AMA Guides, Dr. Nord concluded the evidence was insufficient to meet the criteria for diagnosing complex regional pain syndrome even using the notes of Ms. Harris's rheumatologist and pain management physician. Consistent

9

with Dr. Cole, Dr. Nord assigned 1% under the AMA Guides for Ms. Harris's wrist sprain and ganglion cyst.

The proof further showed Dr. Schrader miscalculated the rating under the Guides by placing Ms. Harris in Class 2 instead of Class 1 based on his own findings.

Moreover, Ms. Harris's contention that she had no hand/arm symptoms at the time of injury was not supported by the evidence. The records showed she had her last cervical treatment 18 months before the injury, and she reported at her September 2023 rheumatology visit worse pain "in the last one to two years." She also said in the last year and a half, "her hands have been significantly bothersome." This history showed Ms. Harris had left-hand symptoms, at least, at the time of her work injury.

Because Drs. Nord, Lochemes, and Cole gave the more probable explanation, the Court finds Ms. Harris sustained a 1% impairment under the AMA Guides for a compensable left wrist sprain and ganglion cyst injury.

### *Vocational Disability*

The extent of Ms. Harris's vocational disability is a question of fact determined by consideration of all the evidence, both expert proof and lay testimony. *Duignan v. Stowers Mach. Corp.,* No. E2018-01120-SC-R3-WC, 2019 Tenn. LEXIS 224, at *22 (Tenn. Workers' Comp. Panel June 19, 2019). The relevant factors the Court must consider are Ms. Harris's skills, training, education, age, local job opportunities, and ability to work at available jobs in her post-injury condition. *Id.* She is entitled to an award of permanent total disability benefits if her injury "totally incapacitates [her] from working at an occupation that brings an income." Tenn. Code Ann. § 50-6-207(4)(B).

Ms. Harris is 58 years old with a high school degree and respiratory therapist certification and has worked in that field for her entire career. She testified she cannot perform any job, avoids using her left arm due to pain, and has difficulty lifting with her left arm.

As for expert medical proof, Dr. Cole restricted her from pushing, pulling, and lifting more than 15 pounds with the left arm; however, he emphasized he gave her the benefit of the doubt in doing so, as the functional capacity evaluator's findings of poor effort on exam were consistent with his own observations. Despite the restrictions, he encouraged Ms. Harris to use her left arm.

10

As for the vocational proof, Dr. Strausser's opinion was flawed and unpersuasive because he based his opinion, in part, on the physicians' restrictions, which he applied *bilaterally* instead of just to her left arm. He also based his opinion on Dr. Schrader's complex regional pain syndrome diagnosis *and* Ms. Harris's significant self-reported restrictions for this left-arm injury.

Contrary to Dr. Strausser, Mr. Brawner determined Ms. Harris is employable based on his complete vocational assessment and her transferrable skills. He found specific sedentary and light occupations she could do under either Dr. Cole's or Dr. Schrader's restrictions. The Court finds Mr. Brawner's thorough and well-supported evaluation more persuasive. Thus, Ms. Harris did not show by a preponderance of the evidence that her work injury *totally* incapacitated her from working at *any* job, and she is not entitled to permanent total disability.

Rather, Ms. Harris is entitled to increased benefits under section 50-6-207(3)(B). She did not return to work at her pre-injury wages when her initial compensation period expired. Baptist could not accommodate Dr. Cole's permanent restrictions. She did not voluntarily resign. The Court holds the 1.35 and 1.2 multipliers apply.

**IT IS, THEREFORE, ORDERED** as follows:

1. Ms. Harris is awarded permanent partial disability benefits of $4,574.40 ($2,823.71 original award plus $1,750.69 in increased benefits).

2. Ms. Harris received an overpayment of temporary disability of $3,764.94, for which Baptist is entitled to a credit. Thus, Baptist shall pay permanent partial disability benefits of $809.64.

3. Ms. Harris's attorney is entitled to a 20% attorney's fee.

4. Baptist shall pay future medical benefits under Tennessee Code Annotated section 50-6-204 with Dr. Cole for the left-wrist sprain and ganglion cyst.

5. The $150.00 filing fee is taxed to Baptist, to be paid to the Court Clerk under Tennessee Compilation Rules and Regulations 0800-02-21-.06 (2026) within five business days, and for which execution might issue if necessary.

6. Baptist shall prepare and submit to the Court Clerk a Statistical Data Form

11

(SD-2) within ten business days of this order becoming final.

7.    Unless appealed, this order becomes final 30 days after issuance.


**ENTERED June 29, 2026.**


*Amber E. Luttrell*
_____
**JUDGE AMBER E. LUTTRELL**
**Court of Workers' Compensation Claims**


## APPENDIX

**Exhibits:**
1.  Medical records index
2.  Dr. Nord's MIRR evaluation
3.  Dr. Schrader's deposition
4.  Dr. Lochemes's deposition
5.  Dr. Strausser's deposition
6.  Mr. Brawner's deposition
7.  Baptist respiratory therapist job description, letter and emails
8.  Petition
9.  Dr. Cole's C-30A
10. Ms. Harris's deposition excerpts (pgs. 59, 79, and 80)

# CERTIFICATE OF SERVICE

I certify that a copy of this order was sent as shown on June 29, 2026.

| Name | Mail | Email | Service sent to: |
|---|---|---|---|
| William B. Ryan, Employee's Attorney | | X | billy@donatilaw.com |
| Jacob Swatley, Employer's Attorney | | X | jswatley@harrisshelton.com |

**PENNY SHRUM, COURT CLERK**
**wc.courtclerk@tn.gov**

13



<u>Right to Appeal</u>:

If you disagree with the Court's Order, you may appeal to the Workers' Compensation Appeals Board.  To do so, you must:

1. Complete the enclosed form entitled "Notice of Appeal" and file it with the Clerk of the Court of Workers' Compensation Claims before the expiration of the deadline.
    ➢ If the order being appealed is "expedited" (also called "interlocutory"), or if the order does not dispose of the case in its entirety, the notice of appeal *must* be filed *within seven (7) business days* of the date the order was filed.
    ➢ If the order being appealed is a "Compensation Order," or if it resolves all issues in the case, the notice of appeal *must* be filed *within thirty (30) calendar days* of the date the Compensation Order was filed.
    When filing the Notice of Appeal, you must serve a copy on the opposing party (or attorney, if represented).

2. You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing the Notice of Appeal.  Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service.  In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the filing fee.  You must file the fully-completed Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal.  **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of your appeal.**

3. You are responsible for ensuring a complete record is presented on appeal.  If no court reporter was present at the hearing, you may request from the Court Clerk the audio recording of the hearing for a $25.00 fee.  If you choose to submit a transcript as part of your appeal, which the Appeals Board has emphasized is important for a meaningful review of the case, a licensed court reporter must prepare the transcript, and you must file it with the Court Clerk.  The Court Clerk will prepare the record for submission to the Appeals Board, and you will receive notice once it has been submitted.  For deadlines related to the filing of transcripts, statements of the evidence, and briefs on appeal, see the applicable rules on the Bureau's website at https://www.tn.gov/wcappealsboard. (Click the "Read Rules" button.)

4. After the Workers' Compensation Judge approves the record and the Court Clerk transmits it to the Appeals Board, a docketing notice will be sent to the parties.

    **If neither party timely files an appeal with the Appeals Board, the Court Order becomes enforceable.  See Tenn. Code Ann. § 50-6-239(d)(3) (expedited/interlocutory orders) and Tenn. Code Ann. § 50-6-239(c)(7) (compensation orders).**

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



# NOTICE OF APPEAL

Tennessee Bureau of Workers' Compensation
www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

**Docket No.:** _____

**State File No.:** _____

**Date of Injury:** _____

_____

**Employee**

v.

_____

**Employer**

Notice is given that _____

*[List name(s) of all appealing party(ies).  Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____    ☐ Motion Order filed on _____

☐ Compensation Order filed on_____    ☐ Other Order filed on_____

issued by Judge _____.

## Statement of the Issues on Appeal

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____
_____
_____
_____

## Parties

**Appellant(s)** (Requesting Party): _____ ☐Employer ☐Employee

Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐Employer ☐Employee

Appellee's Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

### CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 _____.

_____

*[Signature of appellant or attorney for appellant]*



**Tennessee Bureau of Workers' Compensation**
**220 French Landing Drive, I-B**
**Nashville, TN 37243-1002**
**800-332-2667**

### AFFIDAVIT OF INDIGENCY

I, _____, having been duly sworn according to law, make oath that because of my poverty, I am unable to bear the costs of this appeal and request that the filing fee to appeal be waived. The following facts support my poverty.

1. Full Name:_____    2. Address: _____

3. Telephone Number: _____    4. Date of Birth: _____

5. Names and Ages of All Dependents:

_____ Relationship: _____

_____ Relationship: _____

_____ Relationship: _____

_____ Relationship: _____

6. I am employed by: _____

My employer's address is: _____

My employer's phone number is: _____

7. My present monthly household income, after federal income and social security taxes are deducted, is:

$ _____

8. I receive or expect to receive money from the following sources:

| | | | |
|---|---|---|---|
| AFDC | $ _____ per month | beginning | _____ |
| SSI | $ _____ per month | beginning | _____ |
| Retirement | $ _____ per month | beginning | _____ |
| Disability | $ _____ per month | beginning | _____ |
| Unemployment | $ _____ per month | beginning | _____ |
| Worker's Comp. | $ _____ per month | beginning | _____ |
| Other | $ _____ per month | beginning | _____ |

LB-1108 (REV 11/15)                                                                                     RDA 11082

9. My expenses are:

Rent/House Payment $ _____ per month    Medical/Dental $ _____ per month

Groceries      $ _____ per month    Telephone    $ _____ per month

Electricity      $ _____ per month    School Supplies $ _____ per month

Water      $ _____ per month    Clothing    $ _____ per month

Gas      $ _____ per month    Child Care    $ _____ per month

Transportation $ _____ per month    Child Support    $ _____ per month

Car      $_____ per month

Other      $ _____ per month (describe: _____ )

10. Assets:

Automobile    $ _____    (FMV) _____

Checking/Savings Acct. $ _____

House    $ _____    (FMV) _____

Other    $ _____    Describe:_____

11. My debts are:

| Amount Owed | To Whom |
| --- | --- |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

**I hereby declare under the penalty of perjury that the foregoing answers are true, correct, and complete and that I am financially unable to pay the costs of this appeal.**

_____
APPELLANT

Sworn and subscribed before me, a notary public, this

_____ day of _____, 20_____.

_____
NOTARY PUBLIC

My Commission Expires:_____

LB-1108 (REV 11/15)      RDA 11082